IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SHARON LYNN BROWN,

        Plaintiff,

v.

POLK COUNTY, WISCONSIN,
CO STEVEN HILLESHIEM, CO JANET LEE,
CHIEF DEPUTY WES REVELS, and
POLK COUNTY CORRECTIONAL OFFICERS
JOHN DOE 1-10,

        Defendants.

OPINION AND ORDER

18-cv-391-wmc

---

While incarcerated at the Polk County Jail, plaintiff Sharon Lynn Brown (neé Smith) was subjected to a body cavity search following reports by other inmates that she had concealed methamphetamine in her person.[1] The cavity search found no foreign objects or materials. Brown is suing the officers allegedly involved in the search, as well as the County, alleging that they violated her Fourth Amendment rights by conducting a body cavity search without probable cause and a warrant.[2] Presently before the court is defendants' motion for summary judgment. (Dkt. #11.) For the reasons set forth below, this motion will be granted.

---

[1] Although plaintiff went by Smith during the relevant time period, she will be referred to as Brown for purposes of this opinion.

[2] Plaintiff also raised a failure-to-train claim under the Fourth Amendment, however, she has waived that claim by failing to respond to defendants' arguments at summary judgment.

## UNDISPUTED FACTS[3]

### A. Background

A citizen of Minnesota, Brown was incarcerated at the Polk County Jail at all times relevant to this lawsuit. Polk County is located in northwestern Wisconsin. Defendant Janet Lee is a correctional officer at the County Jail. Defendant Steve Hilleshiem also served as a correctional officer at the Jail from January 2003 until mid-July 2018. Defendant Wes Revels was the Jail's chief deputy from June 2016 through March 2018; he also served as the Jail Administrator starting in early 2017.

### B. Policy Governing Cavity Searches

During the relevant time, Polk County had a policy requiring all body cavity searches be performed by a physician, a Wisconsin-licensed registered nurse, or physician's assistant. Correctional officers could request a cavity search based on "reasonable grounds to believe that the [detained] person is concealing weapons, contraband, or evidence in a body cavity, or otherwise believes that the safety and security of the jail would benefit from a body cavity search." (Search Policy (dkt. #12-1) 6.) When reasonable grounds exist, a correctional officer was to make the request for a body cavity search by contacting the shift supervisor, who would then "make the proper arrangements for such a search." (*Id.*) Additionally, the Jail administrator's prior approval was required. (*Id.*)

---

[3] Viewing the evidence and reasonable inferences in a light most favorable to plaintiff as the non-moving party, the following facts are undisputed for purposes of summary judgment, except where noted below.

### C. Brown's Incarceration

Brown was held in custody at the Polk County Jail from May 3-5, 2017. She arrived at the Jail shortly after midnight on May 3, following her arrest for retail theft. On May 3 and 4, Brown was housed in the K Pod with inmates Jacqueline Duke and Amy Nelson. According to Nelson, she had never seen or met Brown before then. (Nelson Decl. (dkt. #15) ¶ 8.)

On May 4, 2017, Duke approached defendant Hilleshiem during medication pass and reported that Brown was concealing "a large amount" of meth in her body cavity. Duke did not say that she had seen the contraband. On the hand, Officer Hilleshiem had no reason to believe -- or even suspect -- that Duke was lying. At the time, Hilleshiem did not know (1) Duke or her background, (2) why Brown was incarcerated, or (3) if Duke had a relationship with Brown. He also did not inquire into these matters. (Hilleshiem Dep. (dkt. #14) 18:2-13; *see also id.* 31:25-32:4 (testifying the reason Brown was incarcerated would not have changed his analysis).) Nevertheless, based on his training and experience, he believed Duke. Hilleshiem then spoke with non-defendants, Jail Nurse Donna Johnson, Sheriff Pete Johnson, and Sergeant Matt Thayer about Brown. Hilleshiem did not speak to Inmate Nelson.

After talking to Hilleshiem, Nurse Johnson spoke with Nelson, Brown and a third inmate. By May 2017, Nurse Johnson had worked at the Polk County Jail for approximately 20 years, during which time she had daily contact with inmates. She had

also been a Certified Correctional Health Professional since at least 1997.[4] Over the course of her time working at the Jail, Nurse Johnson often received written or verbal reports about inmates concealing contraband, hording medication, or acting inappropriately from other inmates. Rarely would these reports result in a formal investigation because through speaking with the inmates involved it often became clear that one inmate was trying to get another in trouble. She drew these conclusions based on her training and experience, her perceived credibility of those involved and the content of the report, such as the detail of the information provided.

As opposed to the frequent, unfounded reports Nurse Johnson received when one inmate was trying to get another in trouble, Nelson's report was very detailed. Nelson informed Johnson that after arriving at K Pod, Brown told Nelson and some of the other inmates that she was concealing between a quarter gram and an eight ball of meth inside her body cavity and asked if they had something else she could conceal the drugs in because she was concerned that: (1) she might absorb the drugs; (2) they were not sealed properly; or (3) they would be found. (Nelson Decl. (dkt. #15) ¶¶ 9-10, 15.) Brown disputes that she told Nelson any of that. (*See* Brown Dep. (dkt. #17) 101:14-102:8 (testifying that she did not recall speaking with Nelson or Duke but that she "had a couple girls telling [her] like the rules or, you know, the things you can and can't do while you're there").) However, she does not otherwise dispute what Johnson or Hilleshiem may have heard from Duke or Nelson. (*See* Defs.' Reply to Pl.'s Resp. to Defs.' PFOF (dkt. #26) ¶¶ 24, 33, 38-42.)

---

[4] The correctional health professional certification focuses on medical and legal standards applicable to healthcare professionals who work with inmates.

Because Nurse Johnson found the information provided by Nelson was not typical of an unfounded allegation -- due both to the level of detail and the credibility of the inmates providing the information -- she did not believe that the inmates who provided the information had an ulterior motive. Instead, Nurse Johnson concluded that the report warranted further investigation, including a cavity search. Hilleshiem also concluded a cavity search was reasonable, although he also testified that he would order a body cavity search *any* time he got a report that an inmate had contraband in their body cavity. (Hilleshiem Dep. (dkt. #17) 19:3-11, 23:2-9.)

Nurse Johnson and other staff members at the Jail then discussed the situation, including the information obtained, their opinions and recommendations, as well as concerns about safety and security, both Brown's and the other inmates'. Hilleshiem specifically was concerned about Brown's safety, as well as the safety of the other inmates.[5] At the end of that discussion, jail staff collectively concluded that Brown should be sent for a cavity search.

Hilleshiem then contacted Wes Revels, the jail administrator, for approval, informing him that Brown reportedly told another inmate that she was concealing drugs in a body cavity and two other inmates reported that fact to jail staff. CO Hilleshiem also told Revels that in his view this information met the policy requirements for a cavity search. Purportedly taking Hilleshiem's word for it, Revels agreed and authorized the search. In

---

[5] Hilleshiem testified that regardless of whether Duke was lying, he "ha[d] a policy to follow," such that if Brown "really ha[d] contraband inside of her and she die[d] or one of the other girls in there die[d] from it," then he "ha[d]n't done [his] job"; on "the flip side[,] . . . if [he] d[id his] job based on what [he had] been told, it [wa]s not for [him] to decide if [the report was] true" -- his "job [was] to follow up on it based on the best of [his] ability." (Hilleshiem Dep. (dkt. #14) 29:4-23.)

particular, Revels' understood that Brown was concealing contraband in her vagina, instead of her anus, but did not know the basis for that conclusion. He, himself, did not speak to the inmates who had reported Brown, nor did he speak to Nurse Johnson; he also did not ask Hilleshiem to investigate any further.[6] Revels did, however, pull Brown's jail file or otherwise inquire why she was jailed.

Following medication pass on May 4, 2017, staff members then returned and asked Brown to exit K Pod, at which point she was escorted to another room and told to wait. After being escorted to yet another room, Jail staff asked Brown if she "had anything" on her. After she answered in the negative, Brown then asked to use the restroom, at which point she was escorted to the bathroom by a female staff member. Consistent with jail protocol, requiring monitoring of an inmate suspected of having contraband when an inmate wanted to use the bathroom, that staff member monitored Brown while she did so.

After using the bathroom, Brown was then handcuffed, leg shackled, and escorted to the back of a squad car by Polk County Deputy Anthony Lehman, where Brown was informed that she was being transported to St. Croix Hospital for a cavity search. Hearing this, Brown did not respond or ask why, nor was she ever told another inmate had reported that she had contraband. While in the squad car, Brown not only had handcuffs and leg shackles, but possibly a "belly" belt. Defendant Lee was not working nor even present at the Jail when Brown was taken for the cavity search.

---

[6] While Revels testified that he would consider the credibility of the inmates in making the accusation as a factor in determining the reasonableness of a cavity search, in this instance, he acknowledged not investigating the complaining inmates' credibility, knowing nothing about their credibility, and not asking Hilleshiem if he knew the complaining inmates, their credibility or possible ulterior motives.

At St. Croix Hospital, Brown and Deputy Lehman waited for about an hour before a nurse brought them into a private room, at which point Lehman removed the handcuffs. The nurse then asked Brown some questions, before providing her with a gown. While Brown changed, Deputy Lehman left the room, returning once Brown was in the gown. At that point, the nurse handed Brown the television remote and advised them that the hospital was very busy, so they would have to wait for the actual search. Following a further wait, the nurse and a doctor returned to the room, at which point Deputy Lehman left again.

The medical professionals then explained that the doctor would perform the cavity search, and the doctor specifically explained that he would perform an ultrasound of her abdomen, a vaginal exam, and then an anal exam. The doctor performed: the ultrasound using an external probe; the vaginal exam with a speculum, which was similar to a routine pelvic examination or pap smear; and finally, the anal exam with a speculum. During the anal exam, there was a technical problem with the light, requiring the medical professionals to find another. While they searched, the speculum remained in her anus. Still, the entire cavity search took less than five minutes, and ultimately the doctor did not locate any foreign objects.

Immediately after the doctor concluded the anal exam, Brown began crying. Lehman then transported Brown back to the Jail. Upon return to the Jail, Brown, who was still crying, asked to stay in a holding cell until the next morning, when she was to be transferred to Barron County, not wanting to cry in front of the other inmates. She cried herself to sleep that night in the holding cell.

Following this event, Brown has been anxious, depressed, and afraid of going outside, being pulled over or going to jail. She also does not like to be alone with men. (Brown Dep. (dkt. #17) 53:18-54:6.)

OPINION

Summary judgment is appropriate if the moving party shows that: (1) "there is no genuine dispute as to any material fact"; and (2) the party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court's role at summary judgment is not to "weigh evidence, make credibility determinations, or decide which inferences to draw from the facts"; rather, its role is "to determine whether there is a genuine issue of triable fact." *Kirkwood v. DeLong*, 683 F. Supp. 2d 823, 826 (N.D. Ind. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007); *Payne v. Pauly*, 337 F.3d 767, 770 (7th Cir. 2003)).

As an initial matter, plaintiff sued CO Janet Lee. She appears to have had no involvement in the underlying events and is entitled to summary judgment without further discussion. *Minix v. Canarecci*, 597 F.3d 824, 833-34 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional deprivation.").[7] The evidence as to CO Hilleshiem is only slightly stronger, since there is no dispute that Duke had told him that Brown admitted hiding a large quantity of meth in her body cavity, and Nurse Johnson told Hilleshiem that Nelson said roughly the same, which she believed,

---

[7] Plaintiff has failed to amend the complaint to identify the John Doe defendants and permitting her to do so now would be unduly prejudicial. Accordingly, they are also entitled to summary judgment.

and that he accurately relayed that information to Administrator Revels. That ends Hilleshiem's role here, having duly turned the matter over to Chief Deputy Revels. Even if a jury could infer that Hilleshiem knew that Revels would ultimately approve the request for a body cavity search to proceed at the hospital, there is no basis for a reasonable jury to find that he knew something was in any way amiss. Regardless, since none of this approaches misconduct, much less an illegal search under the Fourth Amendment, no evidence supports a claim against Hilleshiem either.[8] (See Defs.' Reply to Pl.'s Resp. to Defs.' PFOF (dkt. #26) ¶ 62.)

As to the remaining defendants, Chief Deputy Revels and Polk County contend that they are entitled to summary judgment because all that was needed was "reasonable suspicion" to conduct the challenged search -- not probable cause *or* a warrant -- and the search was conducted in a reasonable manner. (Defs.' Summ. J. Br. (dkt. #20) 12-17.) Plaintiff disagrees, arguing that defendants needed *both* probable cause *and* a warrant to proceed with a cavity search, and since they had neither, the cavity search was unreasonably conducted. (Pl.'s Opp'n (dkt. #22) 10-20.) Brown also disputes defendants' argument as to their reasons for reasonable suspicion. (*Id.* at 20-28.)

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not

---

[8] One way he could be liable would be under a "cat's paw" type theory, which would postulate that Revels was an unbiased decisionmaker, but improperly influenced by Hilleshiem, resulting in him unwittingly acting as a biased non-decisionmaker's "cat's paw." *See Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 378-79 (7th Cir. 2011). However, there is no allegation that Hilleshiem was either biased, nor that he misled Revels in any way.

be violated . . . ." U.S. Const. Amend. IV.⁹  This includes "the right to be free from unreasonable searches of one's unclothed body." *Stanley v. Henson*, 337 F.3d 961, 963 (7th Cir. 2003) (internal citation omitted).¹⁰  While the Fourth Amendment generally requires the issuance of a warrant based on probable cause before a search may proceed, "the Supreme Court has recognized several exceptions to the warrant requirement." *Id.* (citations omitted).  Among those exceptions are warrantless body cavity searches of an individual in custody *provided* reasonable suspicion of the presence of a weapon or contraband.  *See United States v. Freeman*, 691 F.3d 893, 901-02 (7th Cir. 2012) (finding reasonable suspicion sufficient to conduct strip search of defendant that found cocaine between his buttocks before he was booked into jail based on (1) his arrest for attempted cocaine distribution, (2) a drug dog's alerting to the presence of drugs at the scene of the traffic stop where no drugs were found, (3) his attempted sale of cocaine before the stop, (4) knowledge that he had a tendency to conceal drugs between his buttocks and (5) his uncomfortable fidgeting at the police station); *Campbell v. Miller,* 499 F.3d 711, 717 (7th Cir. 2007) (agreeing with jury that police had reasonable suspicion for cavity search of marijuana-possessing arrestee); *Mary Beth G. v. City of Chi.*, 723 F.2d 1263, 1273 (7th Cir. 1983) (concluding that Chicago's blanket policy requiring visual cavity inspection of

---

⁹ The protections of the Fourth Amendment were extended to the states under the Fourteenth Amendment. *See Zoretic v. Darge*, 832 F.3d 639, 643 (7th Cir. 2016) ("The Fourth Amendment's protections against unreasonable searches and seizures is made applicable to state actors under the Fourteenth Amendment." (citing *DKCLM, Ltd. v. Cnty. of Milwaukee*, 794 F.3d 713, 714 (7th Cir. 2015))).

¹⁰ In *Stanley*, plaintiff challenged a clothing-exchange that involved her changing out of her street clothes into a jail uniform while being watched by a same-sex officer, in which her breasts were exposed because she had not worn a brassiere as an unreasonable strip search.  The Seventh Circuit found that this search was reasonable and did not violate the Fourth Amendment.

female misdemeanor arrestees was unreasonable and violated the Fourth Amendment because "the 'need for the *particular* search,' a strip search, is hardly substantial enough, in light of the evidence regarding the incidence of weapons and contraband found in the body cavities of women minor offenders, to justify the severity of the governmental intrusion" without "reasonable suspicion by the authorities that either of the twin dangers of concealing weapons or contraband existed"); *Doe v. Village of Downers Grove*, No. 91 C 2722, 1992 WL 8720, at *2 (N.D. Ill. Jan. 15, 1992) ("The Seventh Circuit has articulated both the 'reasonable suspicion' and 'probable cause' standards" for evaluating strip searches.) (collecting cases).

Even so, searches of individuals in custody must be reasonable. *Stanley*, 337 F.3d at 963 (citations omitted). Courts determining the constitutionality of a search balance "the need for the particular search against the invasion of personal rights that the search entails"; in doing so, considerations include "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Campbell*, 499 F.3d at 716 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). As the intrusiveness of the search increases "the closer governmental authorities must come to demonstrating probable cause for believing that the search will uncover the objects for which the search is being conducted." *Id.* (quoting *Mary Beth G*, 723 F.2d at 1273).

For example, in *Campbell*, the Seventh Circuit ultimately concluded that the search was conducted in an unreasonable manner because it was conducted in public and exposed Campbell's private parts. 499 F.3d at 718. While difficult to define, reasonable suspicion

11

itself "is a commonsense, nontechnical concept that deals with the factual and practical considerations of 'everyday life on which reasonable and prudent [people], not legal technicians, act.'" *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006) (quoting *Ornelas v. United States*, 517 U.S. 690, 695 (1996)).[11] While reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification." *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). Put another way, "reasonable suspicion is less than probable cause but more than a hunch." *Id.* (citing *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003)). On the other hand, "[p]robable cause exists when based on the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched." *United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014). Regardless of which standard ultimately applies, the question is still one of reasonableness through the aforementioned balancing of "the need for the particular search against the invasion of personal rights that the search entails." *Campbell*, 499 F.3d at 716 (quoting *Bell*, 441 U.S. at 559).[12]

---

[11] In *Lawshea*, the Seventh Circuit considered whether police had reasonable suspicion to conduct the *Terry* stop leading to defendant's arrest, ultimately finding that defendant's flight in a high-crime area a little before midnight provided enough for reasonable suspicion. 461 F.3d at 859.

Here, Deputy Chief Revels' decision to send plaintiff to a hospital to conduct a body cavity search was permissible under the Fourth and Fourteenth Amendments if he had a reasonable basis to suspect she had secreted methamphetamine within her person, since that would put her and other people's safety and security at risk with the Jail. As an initial point, there can be no dispute that a body cavity search -- whether visual or manual -- is a substantial impingement on anyone's rights. *See Mary Beth G.*, 723 F.3d at 1272 (reiterating that "strip searches involving the visual inspection of the anal and genital areas as 'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission'" (quoting *Tinetti v. Wittke*, 479 F. Supp. 486, 491 (E.D. Wis. 1979), *aff'd per curiam and adopted by* 620 F.2d 160 (7th Cir. 1980)). On the other side of the balance is the evidence Deputy Chief Revels had indicating that plaintiff was secreting dangerous contraband. In particular, there is no dispute that two inmates separately reported an alleged conversation with plaintiff to different jail staff members. While second-hand, both inmates also reported that plaintiff was concealing a large amount of meth in her body cavity. At least Nelson provided a lot of information, which Nurse Johnson apparently contrasted with the typical unfounded reports she received almost weekly from inmates.

---

[12] Plaintiff argues that there is a difference between visual and manual inspection of body cavities, as recognized in *People v. Hall*, 886 N.E.2d 162 (N.Y. 2008), *cert. denied* 555 U.S. 938. (Pl.'s Opp'n (dkt. #22) 15 n.3.) The only Seventh Circuit authority drawing this distinction the court can find is *Henry v. Hulett*, No. 16-4234, 2019 WL 3229153, at *1 (7th Cir. July 16, 2019) ("[T]he Fourth Amendment does not apply to visual inspections of convicted prisoners but does apply to procedures that entail intrusions within prisoners' bodies." (internal citation omitted)). However, *Henry* is inapposite because it considers the rights of *prisoners* not pretrial detainees and recognizes that "strip searches often are reasonable and thus permissible" under the Fourth Amendment or Due Process Clause. *Id.* at *2.

Unfortunately, the record is less clear how much of that information she relayed to Hilleshiem or what exactly he relayed to defendant Revels. At minimum, it appears undisputed that Hilleshiem, Nurse Johnson and other Jail staff decided that Brown should be sent for a cavity search. It is also apparently undisputed that Hilleshiem then contacted Revels for approval of a cavity search, accurately reporting that two inmates relayed an alleged conversation with Brown in which she admitted concealing drugs in a body cavity.[13] Additionally, Nelson informed Johnson that plaintiff had expressed concern about possibly absorbing some of the drugs because they were inadequately sealed, which was presumably also relayed to Revels. If so, that piece of information would have only added additional exigency to protect plaintiff's safety.[14]

Moreover, there appears to be no dispute that the Jail staff discussed the situation before going to seek approval from Revels, who concurred and ultimately concluded that further investigation was warranted because of the information about plaintiff's possession of contraband. *See Doe v. Calumet City, Ill.*, 754 F. Supp. 1211, 1220 (N.D. Ill. 1990) ("[S]trip search cases have universally demonstrated that one element must be present for

---

[13] Nurse Johnson apparently also spoke with plaintiff following Hilleshiem's conversation with Duke, but neither side provides any detail about the substance of that conversation or how it influenced Johnson's decision-making process. (Johnson Dep. (dkt. #32) 19:10-20:8 (testifying she remembered speaking with plaintiff about the reports from her cellmates, but that she did not remember the specifics); *but see id.* 28:24-29:10 (testifying that when asked plaintiff denied having contraband on her but that Johnson did not find the denial credible at the time, but could not remember why).)

[14] Even if not relayed to him, Revels had a reason to be concerned about this risk based on his own experience as a jail administrator. While there may be an argument that the delay at the hospital countered the exigency of the circumstances, that delay was out of defendants' control. Regardless, at the hospital had plaintiff been secreting improperly sealed meth and absorbed it, Revels certainly knew that she would have garnered better medical attention, more quickly if her condition worsened before, during or after any extraction.

a strip search to be held reasonable: Police officers must have some level of particularized justification to strip search an individual arrestee."). Given the lack of any evidence that defendant Revels had reason to doubt Hilleshiem's report (or the Jail staff's judgment), no reasonable jury could find his reliance on Hilleshiem and Johnson's investigation in finding reasonable suspicion for the search was objectively unreasonable. Indeed, requiring Revels to do his own independent investigation would be inefficient and illogical, as well as irresponsible considering the possible danger posed to plaintiff and her cellmates by the presence of meth. *See United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000) ("When law enforcement officers are in communication regarding a suspect, the knowledge of one officer can be imputed to the other officers under the collective knowledge doctrine.").

While plaintiff points to Hilleshiem's deposition testimony that he would order a body-cavity search any time he got a report that an inmate had contraband in their body cavity (Hilleshiem Dep. (dkt. #17) 19:3-11, 23:2-9), that testimony is beside the point. Plaintiff's was only instance at the Polk County Jail that Hilleshiem observed a staff member request a body cavity search. Regardless, the only evidence is that Hilleshiem accurately passed on reports to the decisionmaker. Revels (relying on his team) concluded that further investigation was necessary.

Also weighing in favor of reasonableness are the manner and location in which the search was conducted. *See Isby v. Duckworth*, 175 F.3d 1020, at *2 (7th Cir. 1999) (unpublished table decision) (identifying considerations for the reasonableness of a cavity search included: hygiene, privacy, training of those conducting the search, and whether the search was performed in a professional manner). Here, the search was conducted at the

15

St. Croix Hospital by a trained medical doctor; the doctor performed the search in a private room, without observation by jail staff or non-medical personnel; and the entire search lasted no more than five minutes. This is consistent with the search conducted in *Isby*, which the Seventh Circuit concluded was reasonable in light of the potential threat to inmate safety from the possible presence of a gun and reasonably performed where "conducted in a private room, by [a doctor]," despite its "intrusive" nature, the doctor laughing before the search, and plaintiff being held down by guards during it. *Id.* at *2-*4 (affirming summary judgment). In contrast, this case is markedly different from the "odious and extremely intrusive" search like that found to violate the Fourth Amendment in *State v. Brown*, No. A17-0870, 2019 WL 3808038 (Minn. Aug. 14, 2019). There, the Minnesota Supreme Court concluded the search was not reasonably justified" because defendant "was alert and capable of consent," but did not, resulting in him being "strapped down to a hospital table" and "sedated without his consent," while the doctor inserted "uncomfortable" instruments into his rectum, "expos[ing] and invad[ing] a part of the body that our society considered especially private," while "nonmedical personnel remained in the room and observed." *Id.* at *9.[15]

Plaintiff argues that it was still unreasonable for the search to include her anal cavity. (Pl.'s Opp'n (dkt. #22) 10.) Defendants respond that they lacked control over the scope of the search. (Defs.' Reply (dkt. #27) 5-7.) The court finds both arguments unpersuasive. While there is no evidence that defendants instructed the doctor which

---

[15] The Minnesota Supreme Court applied the balancing test from *Winston v. Lee*, 470 U.S. 753 (1985).

cavities to search (*see* Nurse Johnson Dep. (dkt. #32) 39:11-40:1 (testifying that the Jail staff did not discuss the scope of the cavity search as it "would be up to the doctors")), deferring to the medical judgment of the doctor is illogical, since Jail staff determines whether a search is necessary and has the information to make the decision as to its scope.

However, the court finds plaintiff's argument unpersuasive as well. Regardless of Revels' more recent recollection (Revels Dep. (dkt. #19) 31:5-14 (identifying concern that plaintiff was concealing drugs in her vagina)), the contemporaneous documents do not specify *where* the contraband was understood to be secreted (Progress Note (dkt. #19-1) 1 (noting "a large quantity of methamphetamine hidden internally"); Incident Rpt. (dkt. #19-1) 2 (noting "a large amount of meth inside her 'body cavity'" (capitalization altered)). While the court credits plaintiff's assertion that the anal cavity search was the most offensive portion of her ordeal, its inclusion is not enough to make the search unreasonable on these facts. *Cf. Green v. Hallam*, 105 F. App'x 858, 862 (7th Cir. 2004) (unpublished) (finding no Fourth Amendment violation where guard digitally searched prisoner's rectum as plaintiff "submitted no evidence to challenge the prison's explanation that the guards had reasonable cause to search [plaintiff] based on the fact that [he] possessed contraband, refused to cooperate, and injured a guard").

Certainly, plaintiff has reason to question Revels' decision to order such an invasive search of her person based on third and fourth-hand reports of her admission, but police chiefs and deputy police chiefs must make such judgments regularly in their positions with lives at stake and as previously noted, the knowledge of other officers is imputed to

Revels.¹⁶ Accordingly, because a reasonable jury could not conclude that the body cavity search of plaintiff was unreasonable, he is entitled to summary judgment,¹⁷ and since none of its actors violated the Fourth Amendment, so is Polk County.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #11) is GRANTED.

2) Plaintiff's motions to reschedule the final pretrial conference or to appear via telephone (dkt. ##36, 37) are DENIED AS MOOT.

3) The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 16th day of August, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[16] Moreover, plaintiff has not come forward with any evidence that Revels or the other officers had a reason to doubt the credibility of the informing inmates. *See e.g.*, *United States v. Clark*, No. 18-2604, 2019 WL 3821808, at *1 (7th Cir. Aug. 15, 2019) (criminal defendant entitled to *Franks* hearing where warrant application omitted "damaging information about the credibility of [the] confidential informant," who had two pending criminal charges, 15 prior convictions, a history of drug abuse, was paid for his services and hoped to receive a reduced sentence). To the contrary, it is undisputed that Hilleshiem had no reason to doubt Duke's report and Nurse Johnson found Nelson's to be credible, as opposed to "the weekly, unfounded reports she regularly received when one inmate was simply trying to get another inmate in trouble." (*See* Defs.' Reply to Pl.'s Resp. to Defs.' PFOF (dkt. #26) ¶¶ 25, 33.)

[17] Even if this reliance could be found unreasonable on these facts by a jury, the absence of any law holding that reliance on multiple hearsay in finding reasonable suspicion of dangerous contraband would entitle Revels to qualified immunity in any event.